**WO** SKC

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

DaJuan Torrell Williams,
Plaintiff,
v.
David Shinn, et al.,
Defendants.

No. CV-21-02151-PHX-MTL (CDB)

**ORDER**

Plaintiff DaJuan Torrell Williams, who is currently confined in the Arizona State Prison Complex (ASPC)-Winslow, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983. This action is currently on remand from the Ninth Circuit Court of Appeals. Defendants move for summary judgment. (Doc. 132.) Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 134), and he failed to file a timely response. Also before the Court are Plaintiff's Supplemental Claim (Doc. 147), which the Court construes as a Motion to Supplement, and Motion for Excusable Neglect (Doc. 151), which the Court construes as a Motion for Extension of Time.

The Court will grant the Motion for Summary Judgment, deny as moot the Motion to Supplement, and deny the Motion for Extension of Time.

## I. Background

On December 15, 2021, Plaintiff, who is in the custody of the Arizona Department of Corrections, Rehabilitation and Reentry (ADCRR), brought this action challenging

ADCRR's implementation of a 2007 amendment to the Arizona statute governing collection of money from a prisoner's trust account for payment of a restitution judgment. Plaintiff alleged that, when he was sentenced in 1999, the trial court issued a restitution order pursuant to Arizona Revised Statute § 13-804(B) and (E), setting restitution at $83,000, and it ordered that "one-third of defendant's wages earned while in prison shall be taken towards restitution payment." (Doc. 1 at 3.) Plaintiff alleged that for the first 10−11 years of his sentence, restitution payments were collected at 30% of Plaintiff's wages earned from his work in prison, but that, in 2009, in response to the 2007 change in Arizona law, the "prison unilaterally . . . altered the terms of [Plaintiff's] sentencing order and [began] deducting and collecting 20% of any and all money, including wages, placed upon [Plaintiff's] Inmate Trust Account (ITA) allegedly for restitution payments." (*Id.*) Plaintiff asserted that there was no court order authorizing this change, and he brought claims against then ADCRR Director Charles Ryan and other prison officials under the Fourteenth Amendment for allegedly stealing from his ITA. In a March 11, 2022 screening Order, the Court dismissed the Complaint and this action as barred by the two-year statute of limitations, finding that Plaintiff's claims accrued in 2009, when ADC allegedly began making the deductions at issue, making Plaintiff's claims filed on December 15, 2021, untimely, and the Court entered judgment the same day. (Docs. 11, 13.)

Plaintiff appealed this judgment, and the Ninth Circuit reversed, finding that "[t]he parties now agree that each deduction from Williams's account was a discrete act, *see Pouncil v. Tilton*, 704 F.3d 568, 579 (9th Cir. 2012), and that claims concerning deductions made on or after December 15, 2019, are therefore timely." (Doc. 19-1 at 2.) The Ninth Circuit remanded the action for the Court to give Plaintiff an opportunity to amend his Complaint to specify the date on which an alleged December 2019 deduction occurred, to show whether he timely brought claims based on that deduction, and for the Court to screen Plaintiff's claims on the merits. (*Id.*) Pursuant to this mandate, on July 29, 2024, the Court reopened this action and gave Plaintiff 30 days to file a first amended complaint (Doc. 21), and on September 4, 2024, Plaintiff filed his First Amended Complaint (Doc. 22).

On screening Plaintiff's three-count First Amended Complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Fourteenth Amendment due process claims in Counts One and Two and Fourteenth Amendment equal protection claims in Count Three against current ADCRR Director Ryan Thornell in his official capacity and against Defendants ADCRR Central Office ITA Manager Robert Ellis, Eyman Complex ITA Manager C. Amos, Eyman Complex ITA Business Manager Cheryl Burtsfield, and three Doe Defendants in their individual capacities. (Doc. 23 at 7.) The Court subsequently granted Plaintiff's Motions to substitute Lewis Complex ITA Business Manager Teresa Brown for Doe 1, dismiss Does 2 and 3, and join Assistant Director of ADCRR's Financial Services Division Richard Evitch as a Defendant. (*See* Docs. 71, 82, 87, 89.)[1]

As before, Plaintiff's claims are based on Defendants' alleged unlawful withdrawals of restitution payments from Plaintiff's "non-wage" ITA deposits, the alleged alteration of Plaintiff's court order without due process, and the alleged unequal application of this new practice to Plaintiff and not to other similarly situated prisoners. Plaintiff's claims pertain to the following alleged unlawful ITA deductions:

1. $546.62 on December 23, 2019, based on a nonwage deposit of $2733.00,
2. $0.14 on February 3, 2022, based on a nonwage deposit of $0.70,
3. $19.00 on March 17, 2022, based on a nonwage deposit of $95.00,
4. $20.00 on June 15, 2022, based on a nonwage deposit of $100.00,
5. $5.00 on July 24, 2022, based on a nonwage deposit of $25.00,
6. $20.00 on July 26, 2022, based on a nonwage deposit of $100.00,
7. $5.00 on August 7, 2022, based on a nonwage deposit of $25.00,
8. $11.00 on August 14, 2022, based on a nonwage deposit of $55.00,

---

[1] The Court subsequently denied Plaintiff's Motions to Amend his First Amended Complaint (*see* Docs. 44, 65, 75, 104), and afterwards, Plaintiff denied seeking to substitute Teresa Brown for Defendant Doe 1 in the operative First Amended Complaint. (Docs. 94, 117.) Consequently, Brown was never served, though she remains on the docket as a Defendant. The Court construes Plaintiff's statements regarding Teresa Brown as a voluntary dismissal of Brown as a Defendant and will dismiss Brown on this basis, or in the alternative, for failure to serve.

9. $15.00 on August 25, 2022, based on a nonwage deposit of $75.00,
10. $800.00 on March 10, 2023, based on a nonwage deposit of $4000.00, and
11. $6.00 on August 1, 2024, based on a nonwage deposit of $30.00.

(Doc. 22 at 9.)

Defendants move for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies, Defendants are entitled to qualified immunity, Defendants Amos and Burtsfield were not personally involved in any alleged restitution deductions, and Plaintiff's claims fail on the merits. (Doc. 132.)[2]

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

---

[2] Defendants also appear to move for summary judgment as to Defendants Thornell, Evitch, and Ellis on the ground Plaintiff's claims began in December 2019, and none of these Defendants were employed by ADCRR at that time. (*See* Doc. 132 at 15.) Defendants misapprehend that the claims against Thornell are not based on Thornell's alleged personal involvement in Plaintiff's ITA deductions but are, instead, based on ADCRR's alleged policy and practice of unlawful ITA deductions, for which Thornell, as the current ADCRR Director, is the proper Defendant in his official capacity to order injunctive relief. *See Flint v. Dennison*, 488 F.3d. 816, 825 (9th Cir. 2007). Defendants also fail to make any substantive argument as to why Defendants Evitch and Ellis cannot be held liable for their alleged involvement in the alleged deductions that took place during the relevant times of their employment.

governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Facts[3]

### A. Plaintiff's Sentence and Court Ordered Restitution

On September 16, 1999, Plaintiff was sentenced to a prison term within ADCRR and ordered to pay restitution, as follows:

> **ORDERED** that the Defendant shall make and pay restitution to the Victim of this crime for the Victim's economic loss, through the Clerk of the Superior Court of Coconino County in the total amount of $82,348.00. $41,689.00 of the total is owed to the victim's insurance carrier, $30,659.00 shall be paid to the victim and $10,000.00 to the Coconino County Victim Witness Program.
>
> **ORDERED** Pursuant to A.R.S. §31-254(D) & (E), payment shall be 50% of the Defendant's prison compensation

[3] Because Plaintiff did not file a timely response or controverting statement of facts, the Court will consider Defendants' supported facts undisputed unless they are clearly controverted by Plaintiff's first-hand allegations in the verified Complaint or other evidence on the record. Where the nonmovant is a pro se litigant, the Court must consider as evidence in opposition to summary judgment all the nonmovant's contentions set forth in a verified complaint or motion. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

> while incarcerated at the Department of Corrections and to continue until restitution is paid in full.

(Doc. 133, Defs.' Statement of Facts (DSOF) ¶ 53; Doc. 133-3 at 9.)

**B. Arizona Law**

Arizona Revised Statutes § 31-230, *Prisoner spendable accounts; fees*, sets forth the responsibilities of the ADCRR Director over prisoner spendable accounts.

In 2007, the Arizona State Legislature amended § 31-230 to read, as follows:

> A. The director shall establish a prisoner spendable account for each prisoner. All monies that are received by a prisoner and that are not required to be deposited in another account shall be deposited in the prisoner's **spendable** account.
>
> B. The director shall adopt rules for the disbursement of monies from prisoner spendable accounts.
>
> **C. If the court has ordered the prisoner to pay restitution pursuant to § 13-603, the director shall withdraw a minimum of twenty per cent, or the balance owing on the restitution amount, up to a maximum of fifty per cent of the monies available in the prisoner's spendable account each month to pay the court ordered restitution.**

(DSOF ¶ 56 (added language in bold).)

In 2024, the Arizona Legislature further amended Section C, as follows:

> If the court has ordered the prisoner to pay restitution pursuant to § 13-603, **unless the court ordered more than twenty percent to be withheld from the prisoner's spendable account**, the director shall withdraw a minimum of twenty percent **or the court-ordered amount to be withheld**, or the balance owing on the restitution amount, up to a maximum of fifty percent of the monies available in the prisoner's spendable account each month to pay the court ordered restitution.

(DSOF ¶ 58 (revised language in bold).)

**C. ADCRR Policies and Deductions**

ADCRR Department Order (DO) 905, *Inmate Trust Account/Money System*, governs the department's deductions from prisoner ITAs, including for court-ordered

criminal restitution. (*Id.* ¶ 59.) Upon receipt of a court order requiring restitution payments, ADCRR's Central Office ITA staff set up the deduction in accordance with DO 905, Attachment A, *Schedule of Deductions from Inmate Monies*. (*Id.* ¶ 61.) Attachment A of the versions of DO 905 going back as far as April 27, 2017 shows "Court Ordered Restitution" is assessed at 20% deduction of deposits to prisoner spendable accounts. (Doc. 133-4 at 3, Ellis Decl. ¶ 5; Doc. 133-4 at 16, 32, 33, 38.)

In October 1999, ADCRR noted in Plaintiff's Inmate Record that Plaintiff had been assessed $82,348.00 in restitution in his criminal case, of which $330.63 had been paid. (Doc. 133-4 at 5, Ellis Decl. ¶ 12; Doc. 139 at 4.) For the first 10−11 years of Plaintiff's sentence, ADCRR deducted 30% of Plaintiff's prison wages for restitution. (Doc. 22 at 5.) However, around 2009, ADCRR began deducting 20% of all deposits to Plaintiff's ITA, not just a percentage of his in-prison earnings. (*Id.*) Since that time, Plaintiff's deduction for the criminal court ordered restitution has remained at 20% of all deposits. (Doc. 133-4 at 5, Ellis Decl. ¶ 13.)

At the relevant time of this action, from December 9, 2019 through August 1, 2024, Plaintiff's ITA records show that the following nonwage ITA deposits incurred 20% deductions for restitution payments:

| Deposit Date | Deposit Amount $ | Deduction Date | Deduction Amount | Deduction Percent |
|---|---|---|---|---|
| 12/09/2019 | 2733.00 | 12/23/2019 | 546.62 | 20% |
| 02/03/2022 | 0.70 | 02/03/2022 | 0.14 | 20% |
| 03/17/2022 | 95.00 | 03/17/2022 | 19.00 | 20% |
| 06/15/2022 | 25.00 | 06/15/2022 | 5.00 | 20% |
| 07/24/2022 | 25.00 | 07/24/2022 | 5.00 | 20% |
| 07/26/2022 | 100.00 | 07/26/2022 | 20.00 | 20% |
| 08/07/2022 | 25.00 | 08/07/2022 | 5.00 | 20% |
| 08/14/2022 | 55.00 | 08/14/2022 | 11.00 | 20% |

| | | | | |
|---|---|---|---|---|
| 08/25/2022 | 75.00 | 08/25/2022 | 15.00 | 20% |
| 02/24/2023 | 4000.00 | 03/10/2023 | 800.00 | 20% |
| 08/01/2024 | 30.00 | 08/01/2024 | 6.00 | 20% |

(*Id.* ¶ 14.)

**D. Defendants' Roles/Responsibilities**

**1. Defendant Evitch**

Since May 2023, Defendant Richard Evitch has worked for ADCRR as the Assistant Director of the Financial Services Division (FSD) in ADCRR's Central Office. (DSOF ¶ 72.) As the Assistant Director, Mr. Evitch oversees ADCRR's financial departments, including such things as Food Services and Procurement. (*Id.*) Mr. Evitch does not set up or oversee court-ordered restitution deductions from prisoner ITAs, which is the responsibility of the Deputy Assistant Director's Office. (*Id.* ¶ 73.)

**2. Defendant Ellis**

Since May 2021, Defendant Robert Ellis has worked for ADCRR as a Deputy Assistant Director of FSD. (*Id.* ¶ 75.) In this role, Mr. Ellis oversees the Accounting Bureau, which has several sections, including Payroll, Accounts Receivable, Accounts Payable, and Inmate Banking. (*Id.* ¶ 75.) Mr. Ellis does not set up or oversee court-ordered restitution deductions from prisoner ITAs. (*Id.* ¶ 76.) Instead, the Accounts Receivable and Banking/ITA Manager directs staff in performing these functions. (*Id.*)

**3. Defendant Burtsfield**

Since February 2012, Defendant Cheryl Burtsfield has worked for ADCRR, and from 2018 through August 2022, she was the Administrative Service Officer (ASO) II responsible for supervising Accounts Payable at ASPC-Eyman and ASPC-Florence. (*Id.* ¶¶ 79–80.) While in this role, neither Ms. Burtsfield nor her subordinate staff set up or oversaw court-ordered restitution deductions from prisoner ITAs. (*Id.* ¶ 80.)

From August 2022 through the present, Ms. Burtsfield has worked as an ASO II overseeing the business office for ASPC-Eyman, which has several sections, including Procurement and Accounts Payable, and ITAs. (*Id.* ¶ 81.) During the relevant time of the

First Amended Complaint, from December 2019 through the present, neither Ms. Burtsfield nor her subordinate staff set up or oversaw court-ordered restitution deductions from prisoner ITAs. (*Id.*)

**4. Defendant Amos**

From 1998 through April 1, 2022, Defendant Christine Amos worked for ADCRR in various roles, including from June 2016 through April 1, 2022, as an ASO II at ASP-Eyman and ASPC-Florence. (*Id.* ¶¶ 83−85.) In this role, Ms. Amos's responsibilities included overseeing prisoner ITAs for approximately 10,000 prisoners, responding to Inmate Letters, and handling phone calls from family members and CO IIIs regarding prisoner issues. (*Id.* ¶ 84.) Neither Ms. Amos nor her subordinate staff set up or oversaw court-ordered restitution deductions from prisoner ITAs. (*Id.*)

**5. Defendant Thornell**

Since January 30, 2023, Defendant Ryan Thornell has been the ADCRR Director. (*Id.* ¶ 78.) Under Arizona law, the ADCRR Director is the state official responsible for prisoner care. Ariz. Rev. Stat. § 41-1604.

## IV. Exhaustion

### A. Legal Standard

Under the Prison Litigation Reform Act (PLRA), a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must

demonstrate that applicable relief remained available in the grievance process). Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

If the defendants move for summary judgment for failure to exhaust and the evidence shows that the plaintiff did, in fact, exhaust all available administrative remedies, it is appropriate for the court to grant summary judgment sua sponte for the nonmovant on the issue. *See Albino*, 747 F.3d at 1176 (pro se prisoner did not cross-move for summary judgment on issue of exhaustion, but because he would have succeeded had he made such a motion, sua sponte grant of summary judgment was appropriate).

**B. Facts Relevant to Exhaustion**

At the time of the ITA deductions at issue in this action, DO 802, *Inmate Grievance Procedure*, set forth the process prisoners must follow to complete ADCRR's standard (non-medical) grievance process. (DSOF ¶ 1.) This process is designed to address prisoner complaints about any aspect of institutional life or condition of confinement that directly affects the prisoner grievant, including Department Orders, Director's instructions, and the actions of staff. (*Id.* ¶ 2.)

Prisoners receive written and oral explanations of the Inmate Grievance Procedure during intake at the outset of their confinement and as part of the orientation process at any subsequent facility. (*Id.* ¶ 5.) DO 802 is also available for prisoner use in the library of each prison unit. (*Id.* ¶ 6.)

From December 9, 2019 through March 1, 2022, ADCRR's standard Inmate Grievance Procedure contained three steps: (1) an Informal Complaint, (2) a Formal Grievance, and (3) an Appeal to the Director. (*Id.* ¶ 21.) On March 2, 2022, ADCRR

added a second-level appeal to the General Counsel as an additional, fourth step, and this revision remained in effect through September 4, 2024, when Plaintiff filed his First Amended Complaint in this action. (*Id.* ¶ 22.)

**1. Step One: Informal Complaint**

Step 1 requires prisoners to attempt to resolve their issues informally through discussion with staff in the area most responsible for the complaint or by submitting an Inmate Informal Complaint Resolution within 10 workdays of the action that caused the complaint. (*Id.* ¶¶ 23, 24.) Prior to March 2, 2022, case numbers were not assigned to Informal Complaints, but on or after March 2, 2022, the Grievance Coordinator would upload the form into the grievance module in the Adult Correctional Information System (ACIS), and ACIS would assign a case number to the Informal Grievance and assign staff to address the issue. (*Id.* ¶ 25.) In either scenario, the assigned staff had 15 days to attempt to resolve the issue informally and provide a written response. (*Id.*)

**2. Step Two: Formal Grievance**

Within 5 workdays of receiving the Informal Complaint Response, the prisoner could proceed to the next step of the process by submitting a Formal Grievance to the unit CO IV Grievance Coordinator. (*Id.* ¶ 28.) Prior to March 2, 2022, the unit CO IV Grievance Coordinator would log and assign a number to the formal grievance using the Unit Coordinator Grievance Log; whereas, on or after March 2, 2022, the case number was already assigned by ACIS at the Informal stage. (*Id.* ¶ 30.) Prior to March 2, 2022, the Deputy Warden (DW) would issue a written response, and on or after March 2, 2022, the unit CO IV Grievance Coordinator would prepare a written response and submit it in ACIS for the DW's approval. (*Id.* ¶ 31.)

**3. Step Three: Appeal to the Director**

Prior to March 2, 2022, the third and final step of the grievance process was for the prisoner to appeal the decision of the DW to the Director within 5 workdays of receipt of that decision by filing an Inmate Grievance Appeal. (*Id.* ¶ 32.) Within 30 calendar days of receiving the Inmate Grievance Appeal, the Central Office Appeals Officer would

prepare a written response for the Director or his delegee to sign. (*Id.* ¶ 34.) The decision of the Director was final and completed all available steps of the grievance process. (*Id.*) On or after March 2, 2022, the prisoner could appeal the decision of the DW to an Assistant Director within 5 workdays of receipt of that decision, and the unit Grievance Coordinator would upload the completed appeal packet into ACIS for the Security Operations Appeals Administrator to review and forward to the appropriate Assistant Director, who would prepare a response and submit it in ACIS, and the unit CO IV Grievance Coordinator would print and forward the response to the prisoner. (*Id.* ¶¶ 35–39.)

**4. Step Four: Appeal to the General Counsel**

On or after March 2, 2022, the prisoner could further appeal the decision of the Assistant Director to the General Counsel within 5 workdays of receipt of that decision by submitting an Inmate Grievance Appeal to the unit CO IV Grievance Coordinator, who would enter the date of the appeal in the Unit Coordinator Grievance Log and upload the appeal packet into ACIS. (*Id.* ¶¶ 40–41.) Within 30 calendar days of receipt of the Inmate Grievance Appeal, the Legal Service Appeals Officer would prepare a response in ACIS for the General Counsel or designee's signature, and the CO IV Grievance Coordinator would print and forward the response to the prisoner. (*Id.* ¶ 43.) The decision of the General Counsel is considered final and ends the available grievance process.

At any step in the grievance process, a submission could be unprocessed and returned to the prisoner for several reasons, including if it was filed past the required timeframe unless there were extenuating circumstances, such as the prisoner not being aware of property losses until returning from court, the hospital, or a criminal detention unit, or the prisoner was designated a vexations grievant and did not use the proper form. (*Id.* ¶¶ 22–23.) Prior to returning unprocessed Informal Complaints, Formal Grievances, or Appeals, the Grievance Coordinator would annotate on the document or in ACSIS the reason for the rejection. (*Id.* ¶ 23.)

**5. Plaintiff's Grievances**

ADCRR Administrative Services Officer IV, Janah Barreras, searched the Central

Office Grievance Appeal Log for grievance appeals Plaintiff filed related to the alleged unlawful restitution deductions based on Plaintiff's nonwage deposits to his ITA between September 9, 2019 and September 4, 2024. (DSOF ¶ 44.) Based on this review, Barreras found that Plaintiff exhausted the following grievances, which she determined were unrelated to the above claims:

1. **Grievance No. 19-012618**, complaining that Plaintiff's outstanding federal and court fees had all been paid, his ITA printout misstated the amount owed, and Plaintiff had a "company check" that needed to get to Inmate Banking.
2. **Grievance No. 20-013486**, complaining that ADCRR was deducting funds to pay court fees that had already been discharged, and it had repeatedly deducted money for court-ordered restitution and ITA fees that brought his account balance to zero.
3. **Grievance No. 20-015860**, complaining that CO II Sanchez failed to respond to and allegedly threw away an Informal Complaint Plaintiff submitted on January 12, 2020 concerning ADCRR's alleged unlawful collection of restitution payments and requesting that CO II Sanchez be sanctioned for throwing away or losing his grievance documents and that Plaintiff be able to utilize the grievance process.

(*Id.* ¶¶ 45–47.)

Although Grievance No. 20-015860 complained about the grievance process, i.e., the loss/destruction of Plaintiff's Informal Complaint concerning unlawful restitution deductions, the staff member (name illegible) who wrote the Inmate Grievance Response also addressed the restitution issue, stating, "[i]n regards to your restitution concerns you have been advised on several time[s] through unprocessed Grievance's that is a matter to be resolved through the court system." (Doc. 133-2 at 63.)

In addition to reviewing Plaintiff's grievances that ended in a final appeal, Barreras reviewed Plaintiff's January 10, 2020 Informal Complaint, which appears to be the Informal Complaint Plaintiff referred to in Grievance No. 20-015860 that he stated he gave to CO II Sanchez on January 12, 2020, but Sanchez threw away or lost. (*Id.* ¶ 49.) In the Informal Complaint, Plaintiff complained that ADCRR banking staff took duplicative

deductions from his ITA, reducing his account balance below zero. (Doc. 133-2 at 70.) He also complained that, after a deposit of $2,733.09 posted to his account on December 23, 2019, 20% ($546.02) was deducted, "possibly for restitution," which Plaintiff stated, "should not be taken." (*Id.*) At the bottom of the form, he wrote "hand to CO II Lopez on January 10, 2020 for CO IV Van Winkle." (*Id.*)

Based on this note and the January 10, 2020 date written on the Informal Complaint, Barerras opines that Plaintiff's submission of this Informal Complaint was untimely because it was not submitted within ten workdays of December 23, 2019, when the alleged wrongful deduction occurred. (DSOF ¶ 49.)[4] In her search of the Central Office grievance appeal records, Barerras also did not find any final grievance appeals of Plaintiff that pertained to the alleged unlawful ITA deductions on December 23, 2029, February 3, 2022, March 17, 2022, June 15, 2022, July 24, 2022, July 26, 2022, August 7, 2022, August 14, 2022, August 25, 2022, March 10, 2023, or August 1, 2023. (Doc. 133-2 at 16−17, Barreras Decl. ¶¶ 61−71.)

**C. Discussion**

Defendants argue that Plaintiff failed to exhaust available remedies because the evidence from ADCRR's Grievance Appeals database shows he failed to grieve each of the alleged unlawful ITA deductions to the highest level of the grievance process. (Doc. 132 at 8.) Although this fact is materially undisputed, the absence of a final appeal

---

[4] Although Defendants produced a copy of this Informal Complaint, which suggests Barreras located it in Plaintiff's grievance records, Defendants do not provide any facts about when the Informal Complaint was initially received, who received it, or if or when any grievance staff responded to it. Barerras merely opines in her Declaration, "[a]ssuming for argument['s] sake that Williams' purportedly missing January 12, 2020 Informal Complaint had been received, it would have been rejected and returned unprocessed for Williams' failure to comply with the rules of the Inmate Grievance Procedure to submit an Informal Complaint within ten workdays from the date of the action that caused the complaint." (Doc. 133-2 at 14−15, Barreras Decl. ¶ 59.) This opinion/speculation about what might have happened *if* the Informal Complaint had been received is not based on personal knowledge and is therefore not entitled to any weight on summary judgment. *See Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412-13 (9th Cir. 1995) (declaration on information and belief is entitled to no weight where declarant lacks personal knowledge).

does not in itself satisfy Defendants' burden of showing Plaintiff failed to exhaust because, under the PLRA, prisoners are only required to exhaust "available" administrative remedies. 42 U.S.C. § 1997e(a). Thus, as an initial matter, Defendants must show that relief remained available to Plaintiff at each step of the administrative remedy process. *See Brown*, 422 F.3d at 936–37 ("[A] defendant must demonstrate that pertinent relief remained available, whether at unexhausted levels of the grievance process or through awaiting the results of the relief already granted as a result of that process."). Moreover, exhaustion is a legal determination, and, regardless of how an entity's grievance procedures define "exhaustion," it does not always require completing every step of an institution's grievance process. *See, e.g.*, *id.* at 935 (a prisoner need not press on to exhaust further levels of review once he has either received all "available" remedies at an intermediate level of review or has been reliably informed by an administrator that no remedies are available).

Here, Defendants base their exhaustion defense entirely on Plaintiff's failure to file a final grievance appeal, leaving out any facts or discussion whether Plaintiff filed any lower-level grievances, and if so, what staff wrote in response. Barreras declares only that she searched "the ADCRR Central Office Grievance Appeal Grid Log for standard (non-medical) grievance appeals to the highest level submitted by" Plaintiff concerning the alleged unlawful restitution deductions. (Doc. 133-2 at 12−13, Barreras Decl. ¶ 55.) Other than to add that she "was asked [by counsel] to analyze Williams' non-exhausted Informal Complaint dated January 10, 2020," (*id.* at 15, Barreras Decl. ¶ 60), Barreras does not claim to have searched any of Plaintiff's lower-level grievance records or looked for unprocessed grievances—either through ACIS or any relevant unit grievance logs—to determine what efforts Plaintiff made to exhaust his administrative remedies at prior levels and how grievance staff responded. Absent this evidence, the Court cannot determine what Plaintiff was told by staff and whether administrative remedies remained available to him. *See Brown*, 422 F.3d at 937 ("[I]nformation provided the prisoner is pertinent because it informs our determination of whether relief was, as a practical matter, 'available'"); *Brown*

*v. Croak*, 312 F.3d 109, 112 (3d Cir. 2002) (available "means 'capable of use; at hand,' and if prison officials inform the prisoner that he cannot file a grievance, the formal grievance proceeding . . . was never 'available' . . . within the meaning of 42 U.S.C. § 1997e")).

Not only have Defendants failed to meet their initial burden as movants of showing that Plaintiff had administrative remedies available to him to grieve the restitution deductions at issue in this action and he failed to exhaust those remedies, but the evidence strongly suggests that no such administrative remedies were available. As noted, the Inmate Grievance Response to Plaintiff's complaint about restitution deductions in Grievance No. 20-015860 stated, "you have been advised [] several time[s] through unprocessed Grievance's that [your restitution concerns are] a matter to be resolved through the court system." (Doc. 133-2 at 63.) Construing these facts in Plaintiff's favor, Plaintiff repeatedly filed lower-level grievances related to the alleged unlawful deductions to his ITA through ADCRR's standard grievance process, and these attempts were consistently rejected and/or returned to him unprocessed on the ground that no remedies were available. On these facts, Defendants have not shown that Plaintiff failed to exhaust "available" administrative remedies before filing this action, *Brown*, 422 F.3d at 935, and their Motion for Summary Judgment based on failure to exhaust is denied.

## V. Defendants' Liability

### A. Defendants Ellis, Evitch, Burtsfield, and Amos

To hold a defendant personally liable under § 1983, a plaintiff must show that he suffered a specific injury because of specific conduct of that defendant and show an affirmative link between the injury and the conduct of that defendant. *See Rizzo v. Goode*, 423 U.S. 362, 371−72, 377 (1976). Here, Defendants have produced declaration evidence from each of the Defendants whom Plaintiff seeks to hold liable in their individual capacities, showing that none of these individuals was personally involved in setting up, approving, or directing others to set up the alleged unlawful restitution deductions from Plaintiff's ITA. (DSOF ¶¶ 73, 76, 80, 89.)

Plaintiff's allegations in his First Amended Complaint and Joinder regarding these Defendants' roles and responsibilities over his ITA deductions are conclusory and do not evince any direct personal knowledge of actions taken by any of these Defendants. (*See* Docs. 22 at 7−8, 71 at 1.) Plaintiff also did not file a timely response or otherwise produce any evidence that would create a genuine issue of material fact that any of these Defendants were personally involved in the restitution deductions at issue in this action. There is also no evidence that any of these Defendants were personally involved in drafting DO 905, which governs the ADCRR's ITA deductions, including the percentage taken from Plaintiff's ITA deposits for restitution. Absent any evidence of personal involvement in these policies or alleged violations, Plaintiff's claims against these Defendants fail as a matter of law, and the Court will grant summary Judgment to Defendants Ellis, Evitch, Burtsfield, and Amos.[5]

**B. Defendant Thornell**

When a state official is sued in his official capacity, the real party in interest is not the individual, but the state. *See Kentucky v. Graham*, 473 U.S. 159, 165– 66 (1985). For a state official to be liable in his official capacity, a plaintiff must show injuries resulting from a policy, practice, or custom of the government entity for which that individual exercises final policy-making authority. *See Cortez v. County of Los Angeles*, 294 F.3d 1186, 1188 (9th Cir. 2002); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983"). However, because states have Eleventh Amendment immunity to suits for damages in federal court, a state official can only be sued in his official capacity for prospective injunctive relief. *See Flint*, 488 F.3d. at 825.

If Plaintiff can show he suffered a constitutional violation based on ADCRR's

---

[5] Based on this finding, the Court need not address Defendants' qualified immunity defense.

alleged policy and practice of withdrawing 20% of all deposits to his ITA for restitution without due process of law or of doing so in a discriminatory manner, in violation of equal protection, Defendant Thornell can be held liable in his official capacity for injunctive relief. To the extent they argue Defendant Thornell is entitled to summary judgment because he was not personally involved in any alleged deprivations (*see* Doc. 132 at 15), Defendants misconstrue the official capacity basis of Plaintiff's claim, and their Motion for Summary Judgment as to Defendant Thornell on this basis is denied.

## VI. Due Process

### A. Legal Standard

Prisoners are entitled to the protections of the Fourteenth Amendment Due Process Clause, whereby they "may not be deprived of life, liberty, or property without due process of law." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citing cases). In analyzing a due process claim, the Court must first decide whether the plaintiff had a protected interest to which due process protections apply. (*Id.* at 556–58.) A prisoner's property interest is "a fundamental example of a protected interest" under the Due Process Clause, and "[t]here is no question that [a prisoner's] interest in the funds in his prison account is a protected property interest." *Shinault v. Hawks*, 782 F.3d 1053, 1057 (9th Cir. 2015) (quoting *Quick v. Jones,* 754 F.2d 1521, 1523 (9th Cir. 1985)) (alterations in original).

"Once a protected interest is found, the court must then decide what process is due." *Quick*, 754 F.2d at 1523. The Supreme Court "usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (citing cases) (emphasis in original). This means that, "[i]n situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." *Id.*

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972) (internal quotation marks omitted)). Determining what

process is due "generally requires consideration of three distinct factors": (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the . . . fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Determining what process is due is a question of law. *Quicks,* 754 F.2d at 1523.

**B. Discussion**

Defendants argue that Plaintiff was not entitled to any process before ADCRR began deducting 20% of all deposits into his spendable account for restitution instead of deducting only a percent from his earnings—as prescribed by the criminal court restitution order—because the change was pursuant to a change in Arizona law, and they argue that, "when the alleged deprivation is pursuant to the enactment of a state statute, individual notice . . . is impossible" and not required. (Doc. 132 at 15.) Defendants rely on *State v. Stocks*, 258 P.3d 208 (Ariz. Ct. App. 2011), in which the Arizona Court of Appeals in turn relied on *Halverson v. Skagit County*, 42 F.3d 1257, 1260 (9th Cir.1994) for the proposition that, where the deprivation is pursuant to a generally applicable law, no individualized pre-deprivation process is required. (*Id.* at 12−13, 15.)

In *Stocks*, a prisoner likewise brought a Fourteenth Amendment due process claim based on ADCRR's (aka DOC's)[6] deductions of 20% of *all* deposits to his spendable account to pay his criminal restitution pursuant to A.R.S. § 31-230(C) when his criminal court order stated only that "payment shall be 30% of Defendant's *earnings* while incarcerated at the Department of Corrections." 258 P.3d at 210 (emphasis in original). In addressing what, if any, process was due in this context, *Stocks* relied in part on *Halverson*, an indirect legislative-takings case in which residents whose homes were flooded due to

[6] At the time, the Department was known only as the Arizona Department of Corrections, and in *Stocks*, the Arizona Court of Appeals referred to it as the Department of Corrections (DOC). For simplicity, the Court will continue to use the terms ADCRR or Department.

the County's implementation of a state law authorizing levees and dikes brought Fourteenth Amendment due process claims, alleging they were entitled to—and did not receive—individualized notice prior to the water diversions that damaged their properties. *Stocks*, 258 P.3d at 212−13 (discussing *Halverson*). The Ninth Circuit disagreed, finding that "[w]hen the action complained of is legislative in nature, due process is satisfied when the legislative body performs its responsibilities in the normal manner prescribed by law," and that "no individual notice and hearing [are] required where county decisions affect vast areas and large numbers of people." *Halverson*, 42 F.3d at 1260 (internal quotation marks and citations omitted).

While recognizing the circumstances were "not identical," *Stocks* noted that, as in *Halverson*, the 20% deductions from the prisoner's spendable account were imposed based on a statute, the substance of which "was disclosed during the legislative process," and that "the statute was not directed at any specific individuals, but rather to a large number of persons." 258 P.3d at 213. With this backdrop, *Stocks* went on to consider the plaintiff's due process rights in the specific context of that case, i.e., the Department's deduction of prisoner funds for restitution pursuant to § 31-230(C), the same statute at issue here. *Id.*

*Stocks* concluded that the prisoner in that case had not suffered a due process violation because, as a prisoner subject to mandatory deductions and other lawfully authorized controls over his wages and use of personal funds from outside deposits, he had a "limited" property interest in the money in his spendable account; ADCRR did not deprive him of these funds but merely allocated a percentage of them toward payment of restitution, thereby lessening his overall restitution obligation; the government has a strong interest in making victims whole through restitution; the prisoner had not shown through his pursuit of post-deprivation remedies (grievances and a trial court motion) that he suffered an erroneous deprivation or that a pre-deprivation notice or hearing would have made a difference; and, finally, "it would be impractical and costly to require a pre-deprivation hearing for every inmate impacted by A.R.S. § 31–230(C)." *Stocks*, 258 P.3d at 214 (*citing Tillman v. Lebanon Cnty. Corr. Facility,* 221 F.3d 410, 422 (3rd Cir. 2000)

(where assessments taken from prison accounts were "routine matters of accounting, with a low risk of error" and the requirement of pre-deprivation hearings would significantly increase costs, post-deprivation procedure was adequate)).

Here, as in *Stocks*, the Court finds the analysis in *Halverson* "helpful" but not dispositive and will likewise consider the due process right at issue "in the specific context of [ADCRR]'s taking of [Plaintiff's] funds pursuant to A.R.S § 31-230(C)." *Stocks*, 258 P.3d at 213.

**1. Plaintiff's Private Interests Affected by Official Action**

As noted, "there is no question that a prisoner's interest in the funds in his prison account is a protected property interest." *Shinault*, 782 F.3d at 1057 (internal quotation marks, alterations, and citation omitted); *see also Quick*, 754 F.2d at 1523 (citing cases) ("[T]here is no question that Quick's interest in the funds in his prison account is a protected property interest"). Nonetheless, as with other constitutional rights, including traditional property rights, Plaintiff's interest in his ITA deposits is necessarily limited by his imprisonment. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979) ("simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations"); *Ward v. Ryan*, 623 F.3d 807, 811 (9th Cir. 2010) (citing cases) (noting that, "[i]nmates forfeit many of their traditional rights to property" and that, "courts have consistently held that [] statutes granting inmates a protected property interest in their wages may also limit and define the contours of such interest").

This principle applies here, "where Arizona statutes impose several limitations on an inmate's spending of his wages and delineate mandatory deductions from inmates' accounts." *Id.* at 812; *see also Stocks*, 258 P.3d at 213 (noting that, "A.R.S. §§ 31–254(D), (E) and 31–230 'delineate mandatory deductions from inmates' accounts,' give DOC 'explicit authority to regulate inmate usage of the funds,' and 'establish a framework under which inmates' property interest in their wages is limited'"). More broadly, the "private interest in the money [prisoners] receive from outside sources" is also subject to legitimate penological limitations, *Mahers v. Halford*, 76 F.3d 951, 954 (8th Cir. 1996) (citing cases),

and at the relevant time of this action, such funds were equally subject to the 20% deductions that Arizona law states the Director "shall withdraw" for restitution under § 31-230(C). Based on these considerations, Plaintiff's private interest in the use of these funds was necessarily limited. 258 P.3d at 214.

Also, as in *Stocks*, Plaintiff was not wholly deprived of these funds. Instead, the 20% deductions were merely allocated by the Department to help pay and reduce Plaintiff's legally binding restitution obligation. *See Mahers*, 76 F.3d at 955 (8th Cir. 1996) ("When an inmate leaves prison, he leaves with his restitution debts. Any payment of those debts while the inmate is incarcerated will work to his ultimate benefit."). At bottom, Plaintiff was deprived of the choice in how to use these funds. The Ninth Circuit has found, however, that prisoners do not have "a current possessory property interest" in the use of funds the Department is lawfully required to set aside for use on their behalf. *Ward*, 623 F.3d at 813 (finding no unconstitutional taking or due process violation where the Department transferred a percentage of a prisoner's wages from his spendable account to that prisoner's personal discharge account pursuant to A.R.S. § 32-237(A), which requires the Director to make such transfers until the discharge account reaches $50.00 to be given to the prisoner upon release). Although *Ward* involved wage deductions from an account reserved for the prisoner's own use upon release, not deductions from all deposits to pay a restitution obligation, the same principles apply here. There is no material dispute that the funds at issue here were deducted to pay Plaintiff's own financial obligations, not to benefit the government or other prisoners, and ADCRR was required under state law to deduct those funds and allocate them for this purpose. Therefore, as in *Ward*, Plaintiff did not have a "current possessory property interest" in those funds as a matter of law.

Finally, as a factual matter, the current record before the Court does not support that ADCRR's policy and practice of deducting 20% of all deposits to Plaintiff's ITA instead of 30% of all earnings had a significant effect on the overall deductions from Plaintiff's spendable account. First, although Plaintiff's due process claim is based on ADCRR's alleged failure to follow the trial court's restitution order, that order stated that "payment

shall be 50% of the Defendant's prison compensation while incarcerated at the Department of Corrections" (Doc. 133-3 at 9); whereas for the next ten to eleven years of Plaintiff's incarceration, ADCRR deducted only 30% of Plaintiff's earnings, to which Plaintiff does not object, and ADCRR currently deducts only 20% of Plaintiff's earnings for restitution—a 30% savings to Plaintiff's spendable account compared to the 50% deduction set forth in Plaintiff's September 16, 1999 restitution order, and a 10% savings to that account compared to ADCRR's prior 30% deductions. Although, under its new policy, ADCRR also began for the first time to deduct 20% from outside deposits for restitution, Plaintiff did not allege any facts showing that this policy change resulted in a net increase in the total deductions taken from his ITA for restitution, and there are no facts on record to make this showing. Here, as in *Stocks*, "[b]ecause of [Plaintiff]'s failure to set forth the amounts taken before and after [ADCRR]'s application of the amended statute, [the Court] cannot be certain that [Plaintiff] in fact has been harmed." 258 P.3d at 214 n.7.

Because Plaintiff's property rights to the funds in his ITA are necessarily limited by his incarceration, and the funds were used to reduce Plaintiff's lawfully imposed restitution obligation, ADCRR's policy and practice of deducting 20% of all deposits to Plaintiff's spendable account for restitution had only a limited impact on Plaintiff's private interest in these funds. Moreover, absent any facts showing the overall amounts deducted for this purpose before and after ADCRR adopted this policy, a trier of fact could not conclude that this alleged infringement on Plaintiff's property interest caused Plaintiff harm.

**2. The Risk of Erroneous Deprivation and the Value of Additional Safeguards**

The Court next considers whether additional safeguards, such as a pre-deprivation notice and hearing, would have lessened the risk of an erroneous deprivation. As already discussed, ADCRR's across-the-board 20% deductions from Plaintiff's ITA deposits for restitution payments was confined to what was required under Arizona law. To the extent Plaintiff alleges that ADCRR impermissibly altered his trial court restitution order to his detriment and was not permitted to make legislatively required deductions not already set

forth in that order, this argument raises a question of state law that is foreclosed by a separate discussion in *Stocks*, in which the Arizona Court of Appeals noted that

> [i]n addition to A.R.S. § 31–230(C), the legislature has given DOC express statutory authority to establish and maintain various inmate accounts with specific and detailed directives relating to the amounts that must be deducted from each of them and the order in which monies in those accounts must be distributed.

258 P.3d at 215 (citing A.R.S. §31-254.) *Stocks* went on to state that,

> [a]lthough A.R.S. §§ 13–603(C) and 13–804(E) give the court authority to determine the manner in which restitution is to be paid when a defendant is not in the custody of DOC, neither statute vests the trial court with authority to control, manage or disburse monies deposited in a defendant's accounts while he is in prison or the power to order DOC to deduct monies from inmate accounts contrary to DOC's comprehensive statutory obligations.

*Id.* (citing cases). *Stocks* concluded that insofar as "the court order specifies the manner in which restitution is to be paid from Defendant's wages while he is in prison and conflicts with the applicable statutes, it is of no effect." *Id.* at 216 (citing cases).[7]

In view of this Arizona Court of Appeals opinion and ADCRR's broad statutory authority over the deductions at issue here, the Court cannot conclude that Plaintiff was subjected to erroneous deprivations. This conclusion is bolstered by the fact that the deductions at issue here were fixed, non-punitive assessments, not arbitrary or targeted deductions. *Cf. Reynolds v. Wagner*, 128 F.3d 166, 180 (3d Cir. 1997) (noting in the context of required prisoner medical fees that the challenged deduction was "a fixed, non-punitive assessment and that these features limit the danger of the prison authorities'

---

[7] Although not squarely at issue in *Stocks*, the Arizona Court of Appeals also rejected any argument that § 31-230(C) could not be applied retroactively to the prisoner in that case. 258 P.3d at 212 n.4. When making determinations under state law, federal courts are bound by the decision of the highest state court and, absent a controlling state court decision, have a duty to predict "how the highest state court would decide the issue." *In re Kekauoha-Alisa*, 674 F.3d 1083, 1088 (9th Cir. 2012) (internal citations omitted).

abusing the power to make unauthorized deductions"). Moreover, to the extent he disagrees and ultimately seeks restoration of these deductions, Plaintiff can bring a state court action for conversion and therefore has an available post-deprivation remedy.

**3. The Government Interest and Burdens of Additional Process**

As already discussed, the government has a strong interest in making victims whole by requiring criminal defendants to pay restitution, as evidenced by the state statutory scheme already discussed. Prison administrators also have a strong interest in implementing uniform policies regarding prison operations, including over such things as required deductions from prisoner ITAs.

Defendants do not show, however, that it would have been unduly burdensome for ADCRR to provide notice to prisoners of the new 20% across-the-board deduction policy for restitution after § 31-230(C) went into effect, and based on the facts in *Stocks*, ADCRR posted notice of the new policy in the prisoner's place of confinement in that action, *see* 258 P.3d at 211, so there is no reason to conclude it could not also have readily done so here. Since Defendants fail to provide any evidence that ADCRR posted any such notices at Plaintiff's place of confinement before its new policy went into effect, there is a genuine issue of material fact whether reasonable pre-deprivation notice was provided to Plaintiff.

Plaintiff was nonetheless on full notice of the new policy at the relevant time of his claims in this action. In his First Amended Complaint, Plaintiff alleged that, due to this change, for the first seven years after ADCRR began deducting 20% from all deposits, he refused to have any deposits placed in his ITA. (Doc. 22 at 6.) It is not clear from his allegations how Plaintiff became aware of the new policy or if he only became aware of it after receiving an outside deposit to which the deduction, without prior notice, applied. In any case, because Plaintiff was fully aware of the policy and its impact on outside deposits to his ITA at the time of the alleged improper deductions in this action, any lack of notice when ADCRR changed its policy, even if a due process violation, did not cause the alleged harm at issue in this lawsuit and is therefore not before the Court.

Based on the factors already discussed above, the Court also finds that any more

robust safeguards, such as a pre-deprivation hearing, would not have changed the outcome here, where Plaintiff's personal interest and control of the funds in his ITA are necessarily limited by his incarcerations, and ADCRR acted in a uniform manner in making the restitution deductions pursuant to a legal duty under A.R.S. § 31-230(C).

Based on the above, the Court finds that Plaintiff did not suffer a Fourteenth Amendment due process violation concerning the alleged wrongful deductions from his ITA in this action, and the Court will grant summary judgment to Defendants on this claim.

**VII. Equal Protection**

Generally, "[t]o state a claim . . . for a violation of the Equal Protection Clause . . . [,] a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). The United States Supreme Court has also recognized "successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also SeaRiver Maritime Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 679 (9th Cir. 2002).

Plaintiff alleged in the First Amended Complaint that Defendants "selectively" choose "which inmates to unlawfully deprive of non-wages monies placed onto their ITAs." (Doc. 22 at 12.) And he alleged he personally knows of at least two inmates who have restitution orders like his own, who only have restitution collected from their wages, not from all monies deposited in their ITAs. (*Id.*)

Defendants have made an initial showing that Plaintiff was not intentionally targeted for disparate treatment from other similarly situated prisoners. The evidence Defendants produced shows that the deductions from Plaintiff's ITA were made pursuant to a department-wide policy set forth in DO 905, requiring 20% deductions from all deposits to all prisoner ITAs for restitution. (Doc. 133-4 at 3, Ellis Decl. ¶ 5; Doc. 133-4 at 16, 32, 33, 38.) There is no evidence on the record that any similarly situated prisoners to Plaintiff

were treated differently from Plaintiff under this policy. It is also not clear from Plaintiff's allegations that Plaintiff has personal knowledge of the restitution deductions from the other prisoners he alleges only receive 20% deductions from their wages, not other deposits. Plaintiff's allegations that Defendants "selectively" apply this policy to him and his reference to at least two other prisoners allegedly not subjected to the same deductions are in any case too vague and conclusory to create a genuine issue of material fact that the policy at issue is intentionally applied in a discriminatory manner to Plaintiff. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."); *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) ("[A] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). Because Plaintiff cannot meet this essential element of his claim on the current record, his equal protection claim fails as a matter of law, and the Court will grant summary judgment to Defendants on this claim.

## VIII. Plaintiff's Motions

### A. Motion for Excusable Neglect

In his Motion for Excusable Neglect, which the Court construes as a Motion for Extension of Time to Respond, Plaintiff seeks an extension of time to respond to Defendants' Motion for Summary Judgment that would make his belated September 3, 2026 Response timely. (Doc. 151.) Plaintiff claims he did not receive the Court's June 8, 2026 Order—in which the Court granted his prior Motion for Extension of Time to Respond and extended the time until July 3, 2026 for Plaintiff to respond to Defendant's Motion—until August 27, 2026, just after he filed his belated August 25, 2026 Response. (*Id.* at 1.) Plaintiff claims that, in the meantime, he acted diligently to prepare his Response, but he did not have access to required evidence or to the assistance of a law librarian while being transported back and forth to Pinal County Jail for various court dates. (*Id.* at 1−2.)

The Court will deny Plaintiff's Motion for Extension of Time. Although Plaintiff

generally explains his difficulties in preparing a timely response while in prison, the Court noted in its prior Order extending the response deadline to July 3, 2026, that, with this extension, Plaintiff had a total of five months to respond, and the Court stated that "this deadline will not be further extended." (Doc. 142.) Taking as true that Plaintiff did not receive this Order until August 27, 2026, this is not a reason to excuse the nearly two-month delay before Plaintiff took any other action to inform the Court of his need for an additional extension of time. In his June 3, 2026 Motion for Extension of Time, Plaintiff requested an additional 30 days to respond, so he was aware that, if granted, he had only until July 3, 2026 to respond. Because Plaintiff missed this extended deadline and failed to request an additional extension within a reasonable time thereafter, his second Motion for Extension of Time is denied, and the Court will strike Plaintiff's belated Response and Controverting Statement of Facts. (Docs. 148, 149.)

In the alternative, even considering Plaintiff's belated Response, the Court finds that it does not change the outcome on summary judgment. First, regarding exhaustion, Plaintiff presents evidence that he was told by multiple staff that he cannot grieve the restitution issue, and he argues that ADCRR's grievance process was therefore effectively unavailable to him. (Doc. 149 at 5−6.) While relevant, even without this added evidence, the Court already found that Defendants are not entitled to summary judgment on exhaustion grounds. Second, as to the merits of Plaintiff's due process claim, Plaintiff points out differences between his case and *Stocks*, and more generally argues that *Stocks* is "bad law." (*Id.* at 7−10.) These arguments do not change the Court's analysis of the relevant *Mathews v. Eldrige* factors or lead to a different conclusion regarding due process. Finally, Plaintiff does not argue or present any evidence of intentional discrimination in ADCRR's application of its policies that would create a genuine issue of material fact that he was denied equal protection of law.

**B. Plaintiff's Supplemental Claim Pursuant to FRCP 15(d)**

Plaintiff filed "Plaintiff's Supplemental Claim Pursuant to FRCP 15(d)," which the Court construes as a Motion to Supplement. (Doc. 147.) In it, Plaintiff seeks to add an

alleged improper November 4, 2025 restitution deduction from his ITA following an October 21, 2025 deposit to that account. (*Id.* at 1.) Because the Court already found that Plaintiff was not denied Fourteenth Amendment due process or equal protection based on the previous alleged improper deductions and will grant summary judgment to Defendants on all claims, the Court will deny the Motion to Supplement as moot.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 132) and Plaintiff's Motion to Supplement (Doc. 147) and Motion for Extension of Time (Doc. 151).

(2) Defendant Teresa Brown is **dismissed** based on Plaintiff's voluntary dismissal and/or failure to serve.

(3) Defendants' Motion for Summary Judgment (Doc. 132) is **granted**.

(4) Plaintiff's Motion to Supplement (Doc. 147) is **denied** as moot.

(5) Plaintiff's Motion for Extension of Time (Doc. 151) is **denied**; the Clerk of Court is directed to **strike** Plaintiff's filings at Docs. 148 and 149 as untimely.

(6) This action is **terminated** with prejudice; the Clerk of Court must **enter judgment** accordingly.

Dated this 15th day of September, 2026.

Michael T. Liburdi

Michael T. Liburdi
United States District Judge